FILED
RICHARD W. NAGEL
CLERK OF COURT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

2015 MAY -6 PM 3: 22

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. **1:15 CR 052** |
| | : | |
| vs. | : | **INDICTMENT**   J. BARRETT |
| | : | |
| | : | 18 U.S.C. § 1349 |
| DAVID JESS MILLER | : | 18 U.S.C. § 1341 |
| ARTUR STEPANYAN | : | 18 U.S.C. § 371 |
|    AKA "ART STEPANYAN" | : | 21 U.S.C. § 333(b)(1) |
| MIHRAN STEPANYAN | : | 21 U.S.C. § 353(e) |
|    AKA "MIKE STEPANYAN" | : | 18 U.S.C. § 1001 |
| MINNESOTA INDEPENDENT | : | NOTICE OF FORFEITURE |
| COOPERATIVE, INC. | : | |

The Grand Jury Charges:

At times material to this Indictment:

## INTRODUCTORY ALLEGATIONS

### Prescription Drug Diversion

1.    The wholesale distribution of prescription drugs in the United States was subject to regulation. Regulating the wholesale market was intended to ensure that drugs dispensed to patients were authentic (i.e., not counterfeit), properly labeled, had been handled and maintained according to Food and Drug Administration ("FDA") requirements and industry standards, had been in the possession of state-licensed entities, and had a chain of custody, also known as a pedigree.

2.     The FDA was an agency within the U.S. Department of Health and Human Services responsible for protecting the public health by assuring the safety, effectiveness, and security of human and veterinary drugs.

3.     Congress enacted the Prescription Drug Marketing Act ("PDMA") in 1988 to combat a practice known as prescription drug diversion.  "Diversion" refers to processes by which prescription drugs are removed from, and then reintroduced into the legitimate chain of licensed wholesale distribution.     Diverted prescription drugs are reintroduced into the wholesale marketplace through various means, including the falsification of the accompanying pedigrees.  Once a prescription drug is diverted outside of the regulated distribution channels, it becomes difficult, if not impossible, for regulators such as the FDA, law enforcement, or end-users to know whether the prescription drug package actually contains the correct drug or the correct dose.  Law enforcement officers, regulators, and end users would not know whether the prescription drug was altered, stored in improper conditions, or had its potency adversely affected.

4.     Drug diverters use a number of different methods to obtain prescription drugs at discounted prices and reintroduce them at higher prices.  In a practice known as street diversion, diverters repurchase dispensed medications from Medicaid or other patients, remove the patient labels, and reintroduce them into the wholesale market. Another common form of diversion, using closed-door pharmacies that are not open to the public, involves the unauthorized resale of drugs that manufacturers sell at steep discounts to hospitals and other healthcare entities.  Another form of diversion entails

relabeling expired drugs with counterfeit labels so that they can be reintroduced into the wholesale market. Some drug diversion involves the reintroduction of stolen prescription drugs into the wholesale distribution chain.

5.     The aim of prescription drug diversion is to acquire drugs at steep discounts and reintroduce them into the wholesale market in a manner that obscures the fact that the drugs were ever diverted. When done effectively, neither the pharmacist nor the consumer know that the diverted drugs have been handled, packaged, and labeled by parties not authorized or qualified to do so.

6.     To prevent drug diversion, the Federal Food, Drug, and Cosmetic Act prohibited any person from engaging in the wholesale distribution in interstate commerce of prescription drugs in a state, unless such person was licensed by that State. Wholesale distribution was defined generally as any distribution of prescription drugs to individuals or entities other than the consumer or patient.

7.     In addition, federal law required wholesale distributors, other than manufacturers and authorized distributors of record, to provide a statement, commonly referred to as a pedigree, for each wholesale distribution of a prescription drug. The pedigree was required to list all previous sales of the prescription drug back to the manufacturer or the authorized distributor of record, including the name and address of each party involved in the prior sales. Requiring the affirmative disclosures on the pedigree discouraged the introduction of diverted prescription drugs purchased from

3

illegitimate sources like unlicensed wholesalers, closed-door pharmacies, street diverters, drug counterfeiters, and thieves.

8.     Authorized distributors of record was defined as "those distributors with whom a manufacturer has established an ongoing relationship to distribute such manufacturer's products." 21 U.S.C. § 353(e)(3)(A). Pursuant to FDA regulation, "ongoing relationship" meant "an association that exists when a manufacturer and a distributor enter into a written agreement under which the distributor is authorized to distribute the manufacturer's products for a period of time or for a number of shipments. If the distributor is not authorized to distribute a manufacturer's entire product line, the agreement must identify the specific drug products that the distributor is authorized to distribute." 21 C.F.R. § 203.3(u). Drug manufacturers were required to maintain and update lists of authorized distributors of record. Many manufacturers made their list of authorized distributors available to the public online on their websites.

**Individuals and Entities**

9.     Defendant **DAVID JESS MILLER ("MILLER")**, a resident of California, was engaged in the wholesale distribution of prescription drugs. **MILLER** was the majority owner of defendant **MINNESOTA INDEPENDENT COOPERATIVE, INC. ("MIC")**. **MILLER** also owned and controlled two California corporations, E-Tail Network, Inc. ("E-Tail") and Biz Support, Inc. ("Biz Support"). At various times during the course of the conspiracy, including from in or about September 2007 through in or about December 2009, **MILLER** used the corporate name E-Tail

4

Network when purchasing diverted prescription drugs from his network of prescription drug suppliers. After approximately December 2009, **MILLER** generally used the corporate name **MIC** when purchasing drugs from his network of drug suppliers. **MILLER** operated MIC and E-Tail from a corporate office in Tustin, California. Biz Support was a retail shipping company in Santa Ana, California controlled by **MILLER**. At various times during the course of the conspiracy, the conspirators used Biz Support to ship prescription drugs from California to/from Puerto Rico, Minnesota, and other states.

10.     Defendant **MIC** was a Minnesota corporation with a warehouse facility in Minnesota. **MIC** engaged in the wholesale distribution of prescription drugs to purchasers in approximately 38 states. **MIC** was licensed to engage in the wholesale distribution of prescription drugs in Minnesota and numerous other states. **MIC** was not licensed to engage in the wholesale distribution of prescription drugs in the State of California.

11.     The business of **MILLER** and his corporate entities, **MIC** and E-Tail, was to purchase diverted prescription drugs from various illicit drug suppliers located in California, Florida, New York, and other states, and then to resell and ship the diverted prescription drugs to customers, including retail pharmacies and other wholesalers, in various states across the United States, including within the Southern District of Ohio.

12.     **MILLER**, through his corporate entities, **MIC** and E-Tail, employed a number of individuals known to the grand jury, including the following:

(a) J.C. handled purchasing prescription drugs from **DAVID MILLER**'s network of drug suppliers. J.C. received offers from the illicit drug suppliers and chose, at the direction of **MILLER**, which drugs E-Tail and **MIC** would purchase. As described in more detail below, at the direction of **DAVID MILLER**, J.C. created fraudulent purchase orders and invoices to hide the fact that **MIC** was purchasing drugs directly from the illicit drug suppliers. At the direction of **DAVID MILLER**, J.C. also created the fraudulent pedigrees associated with **MIC**'s sales of prescription drugs to customers throughout the United States.

(b) B.G. picked up diverted prescription drugs from **MILLER**'s drug suppliers in California, including from defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**. B.G. then shipped the drugs to Puerto Rico or Minnesota, as described below.

(c) M.P. wired payments to **DAVID MILLER**'s drug suppliers from a variety of bank accounts in the names of E-Tail, **MIC**, and B&Y Wholesale, as described below.

(d) J.R. managed the **MIC** warehouse in Minnesota. Along with other warehouse employees, J.R. was responsible for receiving drug shipments, inspecting the drugs for damage and signs of diversion, sorting and organizing the drugs, and using the drugs to fill and ship orders to **MIC**'s customers.

13. Yusef Yassin Gomez ("Yassin") was associated with two Puerto Rico companies. From in or about September 2007 until in or about August 2008, Yassin was

6

employed by Drogueria Caballero del Caribe ("Drogueria Caballero"), a Puerto Rico wholesale drug distributor which was licensed to sell prescription drugs in Puerto Rico. From in or about July 2008 until in or about April 2014, Yassin owned and controlled B&Y Wholesale Distributors ("B&Y"), a Puerto Rico wholesale drug distributor which was licensed to sell prescription drugs in Puerto Rico. Neither of the Puerto Rico companies was an authorized distributor for the manufacturers of any of the prescription drugs involved in the conspiracy charged herein.

14. Defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** sold diverted prescription drugs to **DAVID MILLER** and his company, **MIC**, from in or about July 2009 through at least in or about April 2014. Prior to July 2009, **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** sold diverted prescription drugs to co-conspirator Peter Kats, who sold some of their diverted drugs to **MILLER**. **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** used multiple corporate names in connection with sales of diverted prescription drugs to **MILLER**. These corporate entities included three Nevada corporations, Panda Capital Group, Inc., Red Rock Capital Group, Inc., and Trans Atlantic Capital Group, Inc., and a California corporation, GC National Wholesale, Inc. None of these companies were licensed to engage in the wholesale distribution of prescription drugs in California.

15. Co-conspirator 1 ("CC1") sold, and arranged the sale of, diverted prescription drugs to **MILLER** and his companies, E-Tail and **MIC**, from in or about September 2007 through in or about November 2012. CC1 operated primarily from

7

Miami, Florida. CC1 was not licensed to engage in the wholesale distribution of prescription drugs.

16.     Co-conspirator 2 ("CC2") owned and operated a restaurant called Mayumba in Rosemead, California. CC2 was not licensed to engage in the wholesale distribution of prescription drugs. CC2 participated in the conspiracy by acting as a middleman to facilitate the sale of diverted prescription drugs to from CC1 to **MILLER** and his corporate entities, E-tail and **MIC**.

17.     Co-conspirator Peter Kats ("Kats") sold diverted prescription drugs to **DAVID MILLER**'s companies, E-Tail, and **MIC** from in or about September 2007 through in or about June 2011. At the direction of **DAVID MILLER**, Kats obtained a wholesale license in Pennsylvania and chose the name Independent Wholesale Drug. Kats operated from California and provided his drugs to **DAVID MILLER** in California. Neither Kats nor his company was licensed to engage in the wholesale distribution of drugs in California.

18.     Co-conspirator Joseph Dallal ("Dallal"), doing business as Global Retail Solutions, sold diverted prescription drugs to **DAVID MILLER**'s company, **MIC**, from in or about March 2010 until at least as late as September 2011. Neither Dallal or Global Retail Solutions was licensed to engage in wholesale distribution of drugs in California.

19.     Co-conspirator 3 ("CC3"), doing business as Preferred, Inc., sold diverted prescription drugs to **DAVID MILLER** and his company, **MIC**, from in or about March

2009 through in or about February 2014. Preferred was licensed to engage in the wholesale distribution of prescription drugs in New York.

20.     Co-conspirator 4 ("CC4") was engaged in the wholesale distribution of drugs in California.  CC4 was not licensed to engage in the wholesale distribution of drugs. In 2010 and 2011, CC4 sold diverted prescription drugs to Joseph Dallal, who then sold some of CC4's drugs to **MILLER** and **MIC**.  Subsequently, from in or about December 2011 until in or about December 2012, working with Dallal and other co-conspirators, CC4 sold diverted prescription drugs to **MILLER** and **MIC**, using the business name Modern Medical Products ("Modern Medical").  The real Modern Medical Products, which is a licensed wholesaler headquartered in Los Angeles, California, did not have any connection to these drug sales to **MILLER** and **MIC**.  Instead, CC4 and other co-conspirators simply used the name Modern Medical in selling drugs to **MILLER** and **MIC**.

## COUNT 1
## CONSPIRACY TO COMMIT MAIL & WIRE FRAUD
### 18 U.S.C. § 1349

21.     The Introductory Allegations of this Indictment, above, are realleged and incorporated by reference as though fully set forth herein.

22.     Beginning in or about September 2007 and continuing at least until April 2014, in the Southern District of Ohio and elsewhere, the defendants

**DAVID JESS MILLER**
**ARTUR STEPANYAN**
**MIHRAN STEPANYAN, and**
**MINNESOTA INDEPENDENT COOPERATIVE**

9

did unlawfully, knowingly, and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the grand jury:

(a)    to knowingly and with intent to defraud devise, and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and to knowingly cause to be delivered certain matter by the United States Postal Service and by a private and commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, in violation of 18 U.S.C. § 1341; and

(b)    to knowingly and with intent to defraud devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and to transmit and causing to be transmitted certain wire communications in interstate commerce, for the purpose of executing the scheme, in violation of 18U.S.C. § 1343.

### The Object of the Conspiracy

23.    It was the object of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by purchasing prescription drugs from unlicensed and illegitimate sources and then reintroducing those drugs into the wholesale and retail market through false statements, representations, and promises, including the use of fraudulent pedigrees that falsely represented the sources and origins of the drugs.

<u>**Manner and Means of the Conspiracy**</u>

The manner and means by which the defendants sought to accomplish the object and purpose of the conspiracy included, among other, the following:

24.     **MILLER** and his corporate entities, E-Tail and **MIC**, purchased diverted prescription drugs from a group of unlicensed and illicit suppliers, including defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**, CC1, Peter Kats, Joseph Dallal, CC3, and CC4 ("the illicit drug suppliers").  Yusef Yassin Gomez agreed, in exchange for a monthly commission and/or a percentage of total sales, to allow **MILLER**, at various times, to ship drugs to his Puerto Rico companies, Drogueria Caballero and B&Y, and to claim falsely that **MIC** had purchased the drugs from the Puerto Rico companies.  Beginning at least as early as January 2010, **MILLER** instructed his employees to create fraudulent invoices and purchase orders falsely stating that the illicit drug suppliers sold the drugs to B&Y, and that B&Y then sold the drugs to **MIC**. **MILLER** instructed his employees to pay the illicit drug suppliers by wire transfer from a series of bank accounts in the name of E-Tail Network, **MIC**, and B&Y Wholesale. **MIC** sold the diverted prescription drugs obtained from the illicit suppliers to wholesale and retail customers throughout the United States, including to customers in the Southern District of Ohio, using fraudulent pedigrees to hide the fact that the drugs were obtained from the illicit drug suppliers.

## A.  Purchase of Drugs from Illicit Suppliers

25.    **MILLER** and his corporate entities, E-Tail and **MIC**, purchased diverted prescription drugs from the illicit drug suppliers at prices substantially below the Wholesale Acquisition Cost (WAC) prices for prescription drugs that are legitimately obtained from the drug manufacturer, or from licensed wholesale distributors with a genuine pedigree tracing the drugs back to the manufacturer or an authorized distributor of record.  Accordingly, **MILLER** generally paid the illicit drug suppliers at least 15 percent and as much as 40 percent or more below WAC prices for the diverted prescription drugs.

26.    **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**, using the company names Panda Capital Group, Red Rock Capital Group, Trans Atlantic Capital Group, and GC National Wholesale, sold diverted prescription drugs to **MILLER** and **MIC** from approximately July 2009 until at least April 2014.  To make an offer to **MILLER**, **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** faxed or emailed offer sheets to **MIC**'s office in California, listing prescription drugs that were available for sale.  **MILLER** and his employees chose which drugs to purchase and faxed the list back to **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**.

27.    B.G. then arranged to pick up the drugs from **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** at various locations in the Los Angeles area.

28.    CC1 met **MILLER** through CC2, who owned a restaurant in Rosemead, California.  From in or about September 2007 through in or about October 2012, CC1

12

and **MILLER** used CC2 as an intermediary in the sales of diverted prescription drugs. To make an offer to **MILLER**, CC1 sent faxed offer sheets to CC2 at his restaurant, which listed the drugs available for sale to **MILLER**. CC2 then faxed that list to **MILLER**'s companies. When **MILLER** and his employees decided which drugs to purchase from CC1's offer, **MILLER**'s employees faxed the list to CC2 at his restaurant, and CC2 then faxed that list back to CC1. CC1 and his associates then caused prescription drugs to be shipped to Puerto Rico, as described below.

29.    After approximately October 2012, CC2 no longer served as an intermediary between **MILLER** and CC1. From in or about October 2012 until in or about April 2014, **MILLER** and his employees dealt directly with one of CC1's Miami drug sources.

30.    Peter Kats sold diverted prescription drugs to **MILLER** from approximately September 2007 through approximately June 2011. Kats purchased drugs from street sources, cab drivers, pharmacies, and other drug diverters, including **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**. Kats faxed lists of available drugs to **MILLER** and his companies, E-Tail and **MIC**. After **MILLER** and his employees chose which drugs to purchase, B.G. arranged to pick up the drugs from Kats at various locations in the Los Angeles area, including Kats' personal residence and later an office suite. In or about April 2008, Peter Kats sold a large quantity of Proventil asthma inhalers to **MILLER** for approximately $662,000. The Proventil inhalers were later determined to have been stolen from a tractor trailer before Kats purchased them from

one of his suppliers.  **MILLER** and **MIC** sold a portion of the stolen inhalers to a large

wholesaler in Cincinnati, Ohio, for approximately $1 million.

     31.    Joseph Dallal, doing business as Global Retail Solutions, sold diverted

prescription drugs to **MILLER** from in or about February 2010 until at least as late as

September 2011.  Dallal faxed or emailed a list of available drugs to **MILLER** and his

company, **MIC**.  After **MILLER** and his employees chose which drugs to purchase, B.G.

arranged to pick up the drugs from Dallal at various locations in the Los Angeles area.

     33.    CC3, doing business as Preferred, Inc., sold diverted  prescription drugs to

**MILLER** and **MIC** from sometime in 2008 until about February 2014.  CC3, operating

from his offices in New York and New Jersey, faxed or emailed lists of available drugs to

**MILLER** and his companies.  After **MILLER** and his employees chose which drugs to

purchase, CC3 shipped the drugs to B&Y in Puerto Rico or MIC in Minnesota, as

instructed by **MILLER**.

     34.    CC4 worked with Joseph Dallal and other co-conspirators, using the fake

company name Modern Medical to sell diverted prescription drugs to **MILLER** and

**MIC** from in or about December 2011 until in or about December 2012.  CC4's co-

conspirators faxed and emailed lists of available drugs to **MILLER** and **MIC**.  After

**MILLER** and his employees chose which drugs to purchase, B.G. arranged to pick up

the drugs from CC4 and his co-conspirators at various locations in the Los Angeles area.

**B.  Agreements Between DAVID MILLER and Yusef Yassin Gomez
Involving Drogueria Caballero and B&Y Wholesale**

35.     In or about September 2007, **MILLER** and Yassin agreed to a business

arrangement involving shipments of prescription drugs.  **MILLER** and his corporate

entities, E-Tail and **MIC**, shipped, and directed others to ship, prescription drugs to the

warehouse of Yassin's employer, Drogueria Caballero.

36.     In exchange for allowing **MILLER** to direct shipments of prescription

drugs to the Drogueria Caballero warehouse, **MILLER** agreed to pay Drogueria

Caballero a monthly commission.

37.     **MILLER** and his company, E-Tail, hired an individual known to the grand

jury, whose initials are R.R., to work in the Drogueria Caballero warehouse and handle

shipments of prescription drugs.   R.R. received shipments of drugs from illicit drug

suppliers, including CC1 and Peter Kats.  When **MIC** had orders from customers, R.R.

used the prescription drugs from CC1, Peter Kats, and other illicit suppliers to fill and

ship orders to **MIC**'s customers.

38.     In or about July 2008, Yassin created B&Y in Puerto Rico, with an

individual known to the grand jury whose initials are R.L.

39.     In or about September 2008, Yassin stopped working at Drogueria

Caballero.  In or about December 2008, Drogueria Caballero and **MILLER** ended their

agreement and **MILLER** terminated R.R.'s employment.

40.     Beginning at least as early as February 2009, **MILLER** and his employees

shipped, and caused others to ship, prescription drugs to the B&Y warehouse, with the

15

agreement of Yassin. Those drugs were then re-shipped to the **MIC** warehouse in Minnesota. In exchange for receiving drugs at the B&Y warehouse and then re-shipping them to the **MIC** warehouse in Minnesota, **MILLER** agreed to pay Yassin a monthly commission.

41.     When drugs were received at the B&Y warehouse, B&Y employees created a list of the drugs received, inspected the bottles of drugs for damage and signs of diversion, and then re-shipped the drugs to the **MIC** warehouse in Minnesota.

42.     Beginning in or about November 2010, B.G. began shipping the drugs he collected from the California-based suppliers, including **ARTUR STEPANYAN**, **MIHRAN STEPANYAN**, Peter Kats, and Joseph Dallal, and CC4, directly to the MIC warehouse in Minnesota without first shipping them through the B&Y warehouse.

43.     Beginning in or about November 2012, all of the illicit suppliers, including CC1's Miami drug source, directed shipments of drugs to the **MIC** warehouse in Minnesota without first shipping them through the B&Y Wholesale warehouse.

### C.  Creation of Fraudulent Invoices and Purchase Orders

44.     Beginning at least as early as January 2010 and continuing through at least April 2014, **MILLER** directed **MIC** employees to create fraudulent documents in an effort to make it appear that B&Y, rather than the illicit suppliers, supplied the drugs to **MIC**.

45.     At the direction of **MILLER**, when J.C. chose which drugs to purchase from an illicit supplier, J.C. created offer sheets purporting to reflect offers from the illicit

16

supplier to B&Y, and purchase orders stating that B&Y had purchased the drugs from the illicit drug supplier. J.C. also created invoices in the name of the illicit supplier's company showing a shipment of drugs to B&Y and a payment due from B&Y.

46. After the drugs from the illicit drug suppliers were received at the MIC warehouse in Minnesota, **MIC** employees created additional fraudulent documents. At the direction of **MILLER,** J.R. created purchase orders purporting to show **MIC** purchasing the drugs from B&Y. J.R. emailed the fraudulent purchase orders to B&Y employee A.R. A.R. then used the information from the fraudulent purchase order to create a fraudulent invoice purporting to reflect the sale of the drugs from B&Y to **MIC**.

### D. Wiring Money to the Drug Suppliers

47. **MILLER** and his corporate entities, E-Tail and MIC, paid the illicit drug suppliers by wire transfer. Throughout the conspiracy, the illicit drug suppliers provided wiring instructions to **MILLER**'s employees, including M.P., directing payments to a variety of bank accounts.

48. From in or about September 2007 until in or about December 2009, at **MILLER**'s direction, M.P. paid the illicit drug suppliers by wire transfer from E-Tail Network bank accounts in California at City National Bank and Wells Fargo.

49. From in or about January 2010 until in or about March 2011, at **MILLER**'s direction, M.P. paid the illicit drug suppliers by wire transfer directly from a MIC bank account at Wells Fargo.

50.     In early 2011, in an effort to make the payments to the illicit drug suppliers appear consistent with the fraudulent pedigrees, the conspirators began paying the illicit suppliers from banks accounts in the name of B&Y.  In or about January 2011, Yassin opened a bank account at Wells Fargo in the name of B&Y.  Yassin gave **MILLER** and MIC employee M.P. access to the B&Y bank account at Wells Fargo.  As instructed by **MILLER**, M.P. transferred money from a MIC bank account into the B&Y Wells Fargo account and then sent wire transfers from the B&Y account to pay the illicit drug suppliers.

51.     Beginning in or about July 2011, and continuing through in or about April 2014, **MILLER** instructed M.P. to follow a new procedure to wire payments to suppliers. M.P. wired money from a **MIC** bank account to a B&Y bank account at Doral Bank in Puerto Rico.  The money wired into the B&Y account included money to be paid to one or more of the illicit drug suppliers, as well as Yassin's commission payment. After sending the wire transfer, M.P. sent an email to Yassin, attaching wiring instructions M.P. had received from the illicit drug suppliers indicating the bank accounts where the money should be wired. Yassin then initiated, or instructed B&Y employee A.R. to initiate, wire transfers to the illicit drug suppliers as instructed.

52.     Throughout the conspiracy, the illicit drugs suppliers directed M.P. to wire money to a wide variety of bank accounts.  Defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** directed wire payments to multiple bank accounts in the names of their companies.

18

53.     CC1 and his associates directed wire payments to more than 25 different bank accounts in the names of numerous companies and entities. These accounts were located at banks in Cancun, Mexico; Managuas, Nicaragua; Canada; and numerous banks in Florida.

### E.  Receipt and Handling of Prescription Drug Shipments in Minnesota

54.     Beginning in or about October 2008, shipments of drugs were received at the **MIC** warehouse in Minnesota, either directly from the illicit drug suppliers or re-shipped from B&Y.

55.     When shipments of drugs arrived at the **MIC** warehouse in Minnesota, **MIC** employees organized and inspected the drugs. **MIC** warehouse employees cut the shipping labels off of incoming boxes of prescription drugs and shredded the shipping labels. **MIC** warehouse employees inspected the incoming bottles of prescription drugs for damage and signs of diversion, such as scratches in the label, broken seals, and smudged or illegible lot numbers.

56.     **MIC** warehouse employees weighed incoming drug bottles to identify bottles that may contain the wrong drug or the wrong dosage.

57.     On numerous occasions, **MILLER** and **MIC** discovered various problems and signs of drug diversion with the drugs purchased from the illicit drug suppliers, such as tampered drug bottles, missing inserts, the wrong drug or wrong dosage in the bottle, and scratched or smudged lot numbers. On numerous occasions, **MIC**'s customers returned drugs to **MIC**, stating that the bottles contained the wrong drug, the wrong

19

dosage, or had other signs of drug diversion. **MILLER** instructed **MIC** employees to destroy the drugs or return them to B.G. **MILLER** and **MIC** then continued to purchase drugs from the illicit supplier despite receiving drugs with problems and signs of drug diversion.

58. **MIC** warehouse employees organized the prescription drugs in the warehouse according to the illicit supplier. Employees created signs identifying the warehouse sections for each illicit drug supplier, including "A" for drugs supplied by **ARTUR STEPANYAN** and **MIHRAN STEPANYAN**; "F" referring to CC2, for drugs supplied by CC1 and his associates; "IW," referencing Independent Wholesale, for drugs supplied by Peter Kats; "J" for drugs supplied by Joseph Dallal; "P," referencing Preferred, Inc., for drugs supplied by CC3, and "MM," referring to Modern Medical, for drugs supplied by CC4.

### F. Sale of Drugs to Customers Using Fraudulent Pedigree Documents

59. Throughout the conspiracy, **MIC** created pedigree documents for its sales of prescription drugs to its customers. **MIC** made its pedigree documents available on its website.

60. The standard **MIC** pedigree included, among other information, the name of the drug, drug dosage, National Drug Code number, manufacturer, lot number and expiration date. The pedigree documents also referenced the pedigree requirements of the Federal Food, Drug, and Cosmetic Act and purported to list prior sales of the drug.

61.    From in or about September 2007 through in or about May 2009, the majority of **MIC's** pedigrees stated that **MIC** had purchased its drugs from Drogueria Caballero and that Drogueria Caballero was an authorized distributor for the drug listed on the pedigree. In truth and in fact, **MIC** and/or E-Tail had purchased the drugs directly from the illicit drug suppliers. The drugs were not purchased from Drogueria Caballero. Further, Drogueria Caballero was not an authorized distributor for any of the drugs sold through the conspiracy.

62.    From in or about May 2009 through in or about December 2009, **MILLER** and **MIC** did not use a Puerto Rico company on many of its pedigree documents. At the direction of **MILLER**, many of **MIC's** pedigrees during this time period stated that **MIC** had purchased its drugs directly from one of four large drug wholesale companies that are authorized distributors for many manufacturers. The large wholesalers reflected on these pedigrees included Amerisource Bergen, Cardinal Health, McKesson, and HD Smith. In truth and in fact, **MIC** had purchased the drugs directly from the illicit drug suppliers. The drugs were not purchased from the large wholesale companies reflected on the pedigree documents.

63.    From in or about January 2010 through at least April 2014, nearly all of **MIC's** pedigrees stated that **MIC** had purchased the drugs from B&Y and that B&Y was an authorized distributor for the drug being sold. In truth and in fact, **MIC** had purchased the drugs directly from the illicit drug suppliers. The drugs were not purchased from

B&Y. Further, B&Y Wholesale was not an authorized distributor for any of the drugs sold through the conspiracy.

64.    By using the fraudulent pedigrees described above, **MILLER** and **MIC** concealed and did not disclose to their wholesale or retail customers that they were buying diverted drugs from the illicit drug suppliers. **MIC**'s wholesale and pharmacy customers, and ultimately end-users, purchased what they believed were FDA-approved prescription drugs that had remained in regulated, state-licensed distribution channels intended to protect against misbranded, adulterated, sub-potent, improperly handled, counterfeit, and stolen products. Instead, these customers received drugs of unknown quality and origin whose false pedigrees made it practically impossible to determine the true source of the prescription drugs they were receiving.

**All in violation of 18 U.S.C. §§ 1349 and 2.**

## COUNTS 2-11
## MAIL FRAUD
## 18 U.S.C. § 1341

65.    The Introductory Allegations of this Indictment, above, are realleged and incorporated by reference as though fully set forth herein.

66.    Beginning in or about September 2007 and continuing through at least April 2014, in the Southern District of Ohio and elsewhere, the defendants,

**DAVID JESS MILLER**
**ARTUR STEPANYAN**
**MIHRAN STEPANYAN,** and
**MINNESOTA INDEPENDENT COOPERATIVE**

22

did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing such scheme and artifice and attempting to do so, did knowingly cause to be delivered certain mail matter by private and commercial interstate carrier, according to the directions thereon.

### Object of the Scheme to Defraud

67.     It was the object of the scheme to defraud for the defendants and their co-conspirators to unlawfully enrich themselves by purchasing prescription drugs from unknown or illegitimate sources and reintroducing those drugs into the wholesale and retail market through false statements, representations, and promises, including the use of fraudulent pedigrees that falsely represented the sources and origins of the drugs.

### The Scheme to Defraud

68.     Paragraphs 24 through 64 above (Manner and Means, Count 1) of this Indictment are realleged and incorporated by reference as though fully set forth herein to describe the scheme and artifice to defraud.

### Use of the Mails

69.     On or about the dates specified as to each Count below,

**DAVID JESS MILLER**
**ARTUR STEPANYAN**
**MIHRAN STEPANYAN**, and
**MINNESOTA INDEPENDENT COOPERATIVE**

23

for the purpose of executing and in furtherance of the aforesaid scheme and artifice to

defraud and to obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises, did knowingly cause to be delivered by the

United States Postal Service and by a private and commercial interstate carrier, as

specified in each count below, the items as identified in each Count:

| Count | Approx. Date of Mailing | Invoice Number | Description of Items Mailed |
|---|---|---|---|
| 2 | April 21, 2011 | 8464 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to Bettman's Pharmacy in Dayton, Ohio. |
| 3 | August 25, 2011 | 10194 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to Bettman's Pharmacy in Dayton, Ohio. |
| 4 | June 29, 2012 | 13834 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Cincinnati, Ohio. |
| 5 | September 21, 2012 | 15047 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Cincinnati, Ohio. |
| 6 | October 12, 2012 | 15459 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Cincinnati, Ohio. |
| 7 | October 12, 2012 | 15472 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Newark, Ohio. |
| 8 | November 20, 2012 | 16116 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Dayton, Ohio. |

| 9 | February 6, 2013 | 17260 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Middletown, Ohio. |
| 10 | May 28, 2013 | 19515 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Dayton, Ohio. |
| 11 | March 27, 2014 | 26221 | Shipment of prescription drugs by a commercial interstate carrier from the MIC warehouse in the District of Minnesota to QOL Meds in Cincinnati, Ohio. |

**All in violation of 18 U.S.C. §§ 1341 and 2.**

<u>**COUNT 12**</u>
**Conspiracy –**
**Unlicensed Wholesale Distribution and**
**False Statements**
**18 U.S.C. § 371**

70.  The Introductory Allegations of this Indictment, above, are realleged and incorporated by reference as though fully set forth herein.

71.  Beginning in or about September 2007 and continuing at least until April 2014, in the Southern District of Ohio and elsewhere, the defendants

**DAVID JESS MILLER**
**ARTUR STEPANYAN**
**MIHRAN STEPANYAN, and**
**MINNESOTA INDEPENDENT COOPERATIVE**

did unlawfully, knowingly, and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the grand jury to commit offenses against the United States, to wit:

25

(a)     to knowingly engage, and cause others to engage, in the wholesale distribution in interstate commerce of prescription drugs in a state without being licensed in that state, in violation of 21 U.S.C. §§ 331(t), 353(e)(2)(A), and 333(b)(1)(D); and

(b)     to knowingly and willfully make and use a false document, knowing such document to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the FDA, an agency within the executive branch of the United States, in violation of 18 U.S.C. § 1001.

### The Object of the Conspiracy

72.     It was the object of the conspiracy for defendants, **ARTUR STEPANYAN**, **MIHRAN STEPANYAN**, and other illicit drug suppliers to distribute diverted prescription drugs, without a state wholesale license, to **MILLER** and **MIC**. **MILLER** and **MIC** then reintroduced the drugs into interstate commerce using pedigree documents falsely stating they had purchased the drugs from other entities, including large wholesale companies associated with Yusef Yassin Gomez's companies, Drogueria Caballero and B&Y Wholesale, and falsely stating that Drogueria Caballero and B&Y Wholesale were authorized distributors of the drugs being sold.

### Manner and Means

73.     Paragraphs 24 through 64 above (Manner and Means, Count 1) of this Indictment are realleged and incorporated by reference as though fully set forth herein as the manner and means of the conspiracy described in this Count.

26

## Overt Acts

74. In furtherance of the conspiracy, and to execute and attempt to execute the conspiracy, the defendants and their co-conspirators committed the following overt acts, among others:

(a) On or about October 15, 2009, and on other numerous occasions, defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** faxed an offer sheet listing prescription drugs they were willing to sell to defendants **DAVID MILLER** and **MIC**;

(b) On or about February 18, 2010, and on other numerous occasions, defendants **ARTUR STEPANYAN** and **MIHRAN STEPANYAN** delivered prescription drugs to B.G., an employee of defendants **DAVID MILLER** and **MIC,** at various locations in Southern California;

(c) On or about the dates in Counts 2 through 11, above, and on other numerous occasions, defendants **DAVID MILLER** and **MIC** shipped prescription drugs, including drugs obtained from **ARTUR STEPANYAN** and **MIHRAN STEPANYAN,** to customers in the Southern District of Ohio;

(d) On or about January 21, 2010, MIC wired approximately $302,801.69 to Red Rock Capital bank account number XXXXXX1781 at Wells Fargo.

(e) On or about May 20, 2010, MIC wired approximately $262,338.74 to Red Rock Capital bank account number XXXXXX1781 at Wells Fargo.

(f)      On or about August 19, 2010, MIC wired approximately $475,818.22 to Trans Atlantic Capital bank account number XXXXXX1951 at Nevada State Bank.

(g)      On or about February 25, 2011, MIC wired approximately $408,000 to Trans Atlantic Capital bank account number XXXXXX1951 at Nevada State Bank.

(h)      On or about April 1, 2011, MIC employee M.P. wired approximately $336,815.89 from a B&Y Wholesale bank account to Trans Atlantic bank account number XXXXXX1951 at Nevada State Bank.

(i)      On or about June 28, 2011, MIC employee M.P. wired approximately $426,231.17 from a B&Y Wholesale bank account to Trans Atlantic Capital bank account number XXXXXX9418 at Chase Bank.

(j)      On or about December 8, 2011, co-conspirator Yassin wired approximately $1,125,543.35 from a B&Y Wholesale bank account to Trans Atlantic Capital bank account number XXXXXX5875 at CitiBank.

(k)      On or about March 15, 2012, co-conspirator Yassin wired approximately $622,925.69 from a B&Y Wholesale bank account to GC National Wholesale bank account number XXXXXX6534 at CitiBank.

(l)      On or about July 16, 2013, an employee of B&Y wired approximately $1,394,863.34 from a B&Y Wholesale bank account to GC National Wholesale bank account number XXXXXX6534 at CitiBank.

(m)   On or about November 13, 2013, an employee of B&Y wired approximately $1,489,473.73 from a B&Y Wholesale bank account to GC National Wholesale bank account number XXXXXX6534 at CitiBank.

(n)   On or about February 7, 2014, an employee of B&Y wired approximately $1,055,979.04 from a B&Y Wholesale bank account to GC National Wholesale bank account number XXXXXX4292 at Bank of America.

**All in violation of 18 U.S.C. §§ 371 and 2.**

## FORFEITURE ALLEGATION

1.   The allegations contained in this Indictment are re-alleged and incorporated by reference as if fully set forth in support of this forfeiture.

2.   Upon conviction of any offense alleged in Count One (Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Section 1349), Counts Two through Eleven (Mail Fraud, in violation of Title 18, United States Code, Section 1341), and Count Twelve (Unlicensed Wholesale Distribution, in violation of Title 21, United States Code, Section 333) of this Indictment, **DAVID JESS MILLER, MINNESOTA INDEPENDENT COOPERATIVE, ARTUR STEPANYAN,** and **MIHRAN STEPANYAN,** jointly and severally, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme and artifice to defraud as alleged in the conspiracy to commit the offenses.

29

3.   The property to be forfeited as to all counts of this Indictment, includes the following:

    (a.)   REAL PROPERTY

        i.   Real property known and numbered as 1634 La Loma Drive, Santa Ana, Orange County, California, 92705 with all appurtenances, improvements, and attachments thereon; and

        ii.   Real property known and numbered as 1422 Edinger Avenue, Suite 1230, Tustin, Orange County, California 92780 with all appurtenances, improvements, and attachments thereon.

    (b.)   MONEY JUDGMENT

        i.   A money judgment in the amount of at least \$393,806,127.77 in United States currency, representing the amount of proceeds obtained as a result of the conspiracy to commit mail and wire fraud, the mail fraud offenses, and unlicensed wholesale distribution.

4.   If any of the property described above, as a result of any act or omission of **DAVID JESS MILLER, MINNESOTA INDEPENDENT COOPERATIVE, ARTUR STEPANYAN,** and **MIHRAN STEPANYAN:**

    (a.)   cannot be located upon the exercise of due diligence;

    (b.)   has been transferred or sold to, or deposited with, a third party;

    (c.)   has been placed beyond the jurisdiction of the Court;

(d.)   has been substantially diminished in value; or

(e.)   has been comingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of **DAVID JESS MILLER, MINNESOTA INDEPENDENT COOPERATIVE, ARTUR STEPANYAN, and MIHRAN STEPANYAN,** up to the value of the property listed above as being subject to forfeiture.

A True Bill.

_____
Grand Jury Foreperson

CARTER M. STEWART
United States Attorney

_____
BRENDA S. SHOEMAKER (0041411)
Financial Crimes Chief

31